Good morning, Counsel. Good morning, Your Honor, and may it please the Court. Deanne Maynard for Nuvasiv, and I'd like to save four minutes for rebuttal. Okay, we'll try to help you. Just keep your eye on the clock, okay? Thanks very much, Your Honor. The $27.5 million judgment should be reversed for multiple reasons. At bottom, the judgment rests on a fundamental mismatch between the damages that MMI sought and its theory of liability. The jury awarded MMI the profits it lost from the termination of its exclusive distributorship with Nuvasiv. But it's undisputed that Nuvasiv had the right to terminate the distributorship, and MMI has no claim with respect to that termination. But isn't there evidence in the record that that termination would not have occurred if the distributorship had Nuvasiv not been able to obtain the services of the MMI representatives? That's what they claim, Judge Chen, but even accepting that as true, that can't be the legal but-for cause of the termination, which undisputedly occurred before it. The plan is not the tort. Why does a but-for causation have to rely on a temporal sequence? I mean, that's the basis of your argument. It can't occur after. But yet you could still say if you wouldn't have done A, if you didn't do A, you wouldn't have done B, even if B happened moments before A. Why isn't that still causation? Because the tort in California of intentional interference with business relationships requires resulting damage. It has to result from the tort. Here the tort didn't occur until after the agreement, the distributorship agreement, what the parties call the ESR, was terminated. And so the restatement says it's totally settled that you can't be the but-for cause of something that happens before. Counsel, with respect, if I understand the record correctly, the allegation is, and apparently that's what the jury found, was that Nuvasiv had a scheme where it basically infiltrated all of the salespeople, set them up to immediately come over. In effect, they gutted the organization. They took its assets, if you will, these people that had been highly trained, took them right over. And so if it's true, that occurred before the termination of the contract. So if that's right, then your argument that the damages couldn't have been right is not necessarily correct, is it? I think, yes, I do. It is right, even assuming all those facts is true, Judge Smith, because the planning is not the tort. The tort, and if you study the red brief in this case, everything they point to, the intentional interference acts did not occur until after the ESR was terminated. Even if the employees were solicited and an agreement, quote, unquote, was sort of made, that's not a tort? I mean, you basically conspire to have this plan that happened a second after the termination is effected. That's not a tort? No, because the tort, Your Honor, was inducing the employees to breach their agreement not to compete with MMI. That's the alleged tort. And none of the ‑‑ there's no evidence on the record that any breaches of that agreement, the competing, occurred until after the ESR was terminated. But I'd like to take a step ‑‑ But the act of inducing occurred before. Maybe their act of actual breach didn't occur until the moment they signed up, but they were induced. But the fourth element of intentional inducing is actual or disruption of the actual contract. And that element, and if that element is not satisfied, the tort has not occurred, and there are cases in California where element four is not satisfied and the claim is rejected. That element did not occur until after the ESR was terminated. Well, but part of the contract is 6.13, right? That's the anti‑competition clause that's been discussed a great deal. The 6.13, Your Honor, is in the contract between Nuvasiv and MMI. The agreements that MMI alleges were breached are in the employment agreements, which are provisions 5.4 and 5.5, which is at ER 420. But I would like to ‑‑ so just to close the loop on that point, which is our third argument in our brief, that there's no causal connection between the alleged inducement, which didn't occur until after the ESR was terminated. The ESR's termination caused the profits that they sought, caused the loss of the profits that the jury gave them. That harm would have occurred even if the employees had not agreed. If they'd had the meetings after the termination and the employees had said, no, actually, we don't ‑‑ we're not going to join, there would have been no tort because the tort hadn't occurred yet, and the same harm would have already occurred. As a matter of California law ‑‑ or attempt to induce. So why can't the predicate act of inducing be deemed a violation of the employment agreement? Because they didn't rely on that provision, Your Honor. No evidence in the record supports. That's what the employees, the MMI employees, are not to do. The district judge dropped a footnote saying, acknowledging that all the acts of actual breach occurred after the termination, but suggested a theory whereby Nuvasiv induced the employees to induce Nuvasiv to terminate the ESR, but they don't defend that, and for good reason, that doesn't make any sense. There is, if I recall correctly, there is evidence that that, in fact, occurred with respect to a few employees. Isn't that correct? Where you had MMI contacted some employees before the contract was terminated, told them what was going to happen, offered them opportunities. They, in turn, contacted additional MMI employees, told them what was going to happen. You had a whole bunch of people that were talking and had it all set up. Now, that's very different than just a hermetically sealed, there's a termination and there would be no damages until after that occurred. This is, if you will, a conspiracy beforehand, an inducement to make certain it was all ready, because at least if I understand the evidence, Nuvasiv would have never terminated this if they'd lost all these salespeople. They couldn't function without them. It was a sine qua non of doing it in the first place. So I'm having difficulty seeing how you can say, well, whatever happened before, it doesn't matter because we wouldn't terminate the contract anyway, and yet the evidence, if I recall correctly, was that you would have never terminated it before without having set this up because it would have immediately failed. You would have had no people. Isn't that right? Even if there was evidence of a plan to do something tortuous after the ESR was terminated, it's undisputed that the ESR termination occurred first, before the tort, before all the acts of the tort. Again, maybe I misread the evidence, but as I just said to you, I thought there was evidence that a number of these people were contacted before the termination. They were induced. They, in effect, had deals. They had jobs to immediately go to, and some of them were actually celebrating before the contract was terminated. Isn't that correct? Even if you assume that to be true, Your Honor, that does not complete the tort of intentional interference because they had to actually disrupt the contract relation or breach, and you can read the red brief in vain in this section of the brief, and they are talking about a plan for actions that occur after, and they are trying to defend the judgment on the grounds that even though it occurred after, that can be a but for cause, and I don't think that's right. Poison all the employees and shift their loyalty before it ever happens. How is that not creating damages? How is it not undermining MMI before the termination of the contract? Because what they were allegedly induced to do, Your Honor, is to compete against MMI, and that didn't occur until after the termination. But if I could step back because our larger point here is that the contract that Nuvasiv had with MMI allowed it to pay for the right to hire these employees and have them continue working in the same areas they had been working before, continue their services uninterrupted to Nuvasiv. And specifically in 11.7 in the ESR agreement, the contract between Nuvasiv and MMI, which allowed Nuvasiv to terminate, stated that if MMI was in poor standing, as no one disputes that they were, Nuvasiv had the right to terminate, as nobody disputes that they did, and upon payment it could choose to pay the so-called stated percentage, which here added up to $1.75 million. And for that payment, they got the transfer of the compliance agreements that MMI had with its employees, and those compliance agreements encompassed the employment agreements that MMI had with its employees in order to ensure that the services of those employees could continue uninterrupted on behalf of Nuvasiv. That's the language in 11.7. But the compliance agreement is defined in 6.13, and it is meant to obtain assurance of certain restrictions that are contained therein. Now, those are anticompetition provisions vis-à-vis Nuvasiv. It doesn't mean everything that's in there. There's stuff in an employment agreement that may have nothing to do with Nuvasiv. Your Honor, I think to say the same thing. It's defined, it's delimited itself within 6.13, the term compliance agreement where it's defined, in quotes, talks about informants of insufficient to contractually obligate such person to comply with the restrictions contained in this 6.13. It does, Your Honor, but it makes clear two other things. One is it's not just those restrictions, which is what the district court believed, because as you go down further, like the third to the last line of that paragraph, it also has to, each compliance agreement shall also require sales representatives to comply with the terms of section 6.10 and 6.12. And it makes clear four lines or five lines above that, that the representative shall provide Nuvasiv a copy of each compliant, a copy. The compliance agreement is not an amorphous bundle of rights. It's the employment agreement that MMI had with its employees. And that's the only reading that makes sense of the contract as a whole. If you think about it, as Judge Smith was pointing out, these are highly trained ---- I don't see why you say that's the only way to interpret this, because this is all about noncompetition with Nuvasiv. This is the paragraph that I think defines Nuvasiv as having third-party beneficiary status, correct? It is, Your Honor, but what ---- So why would Nuvasiv be an intended third-party beneficiary of a deal between MMI and its representative not to compete against MMI? It would be the third-party beneficiary of any covenant not to compete with Nuvasiv. So I don't ---- it all fits together, it seems to me. No, Your Honor. So I want two points. One, the third-party beneficiary is a separate argument. This is our interpretation of the contract. And I think ---- But it's in 613. I'm trying to construe what 613 means. And it has several provisions that point to a narrow interpretation of compliance agreements. Number one, it defines itself as rights herein, and rights herein is 613. But it also refers to 610, 612. I grant you that, but that's because it's referred to in 613. So it's all within the confines of 613. Second of all, it's clear that this ---- the beneficiary of this compliance agreement is Nuvasiv. And this is about competition, anti-competition to protect Nuvasiv. I don't think this is the only way to read 613, which talks about a copy of the agreement, which is a freestanding agreement. And I think when you step back and look at the agreement as a whole, especially in context, Judge Chen, it can't mean what you're saying because it makes no sense. It makes 11.7 and 11.5. Basically neither of them perform the function that they're intended to perform. Let me ask you this. The ---- if I recall the record correctly, the contracts were prepared by Nuvasiv, right? This was their, if you will, forum contracts. The ESR was prepared by Nuvasiv. Correct. And so the standard provisions of such contracts, or at least the law interpreting them, is if there's ambiguity, it's construed against the draft person, right? Not ---- that's not the first stop, Your Honor. So under California law, you only get to that canon if you've applied all the other constructive canons and you're still ambiguous. And I think that you can't read this to make sense if you read it the way the district court has read it. You're saying it's not even ambiguous. You won't even give it that much. You say it's unambiguous. It ---- when you read it in context, the meaning of 11.5 and 11.7 makes clear that the agreements, or at least they must encompass a release of any obligations MMI's employees have to Nuvasiv. And if I could try to explain why that's so. Before you do that, I just want to follow up on this point. The ---- you seem to be at cross purposes here. On the one hand, you say there's only one way to read this. Judge Schentz pointed out the district court didn't read it that way. I ask you if there's ambiguity how we construe that. And you say it's not ambiguous. So we're kind of going round and round. Obviously, somebody read it differently than you did, specifically the district court. So we're stuck with this issue. You know, as a long-term business lawyer, I can tell you it seems a little ambiguous to me. So if it is ambiguous in certain points, don't we have to look at that construction? This is Nuvasiv's contract. They know the contract. They know how they want to work it. Don't we construe it against them? Or are you going to say they have really good lawyers and it doesn't matter? No, Your Honor. I'll grant you that it could have been more simply stated than it is here. But if you read it in context, it's not ambiguous. And the reason you can't read it the way the district court did and the canon that you apply before you get to the canon Your Honor is talking about is that it must be read to make sense. And if you read 11.5 and 11.7 to not release the employees from their obligations to MMI, then neither of those provisions will do what they're clearly intended to do, which is to allow in one case in a material breach by MMI, in the other case when MMI is in poor standing and the stated percentage is paid, to allow the employees to continue to work in the same sales territory. And if I could walk you through it, if I could just try to put together why that's so. So in 11.5, and I don't think that MMI disputes that if they had been terminated, if we'd relied on 11.5D, which is an ER 440, and had claimed that we could hire them under that provision, they would agree that we could both hire and have the employees work in the same territories. But there's no sentence in 11.5 other than the transfer of the compliance agreements that releases them from their obligations to MMI. The right to hire alone is not what's in dispute. The right to hire, and in the record there's an example where MMI hired someone from Medtronic and hired them, they had the right to hire them, but they had to sit them out for a year and not compete. The right to hire is not the right to be released from your non-compete. It's the transfer of the compliance agreements in 11.5 that allows that. And similarly, in 11.7, it's the transfer of the compliance agreements that allows the fulfilling of the purpose that if Nuvasiv pays the stated percentage, which again is $1.75 million here, it's a significant sum of money, what they obtain is the release of the employees from their obligations to MMI so that they can ensure that the services of all representative affiliates, which include the salespeople, are continued uninterrupted on behalf of Nuvasiv. And if you don't read the compliance agreements to transfer the obligations, the non-compete obligations the employees had to MMI, then they couldn't work, continue working for Nuvasiv in 11.7. They couldn't continue working for Nuvasiv in a material breach under 11.5. And in fact, higher up in 11.7, they couldn't continue working for the acquiring company in the change of control situation. And that, Your Honor, doesn't make any sense. They couldn't stay with MMI having the compliance agreement transferred, which means they can't do anything against Nuvasiv. Are you saying they could not work for MMI and do some other kind of work that's not competitive with Nuvasiv? If the way that I read this agreement, Your Honor, this payment of the stated percentage transfers the employment obligations the employee has to MMI to Nuvasiv. The compliance agreement. It does say assign the compliance agreement. The compliance agreement means you can't compete against Nuvasiv. That doesn't necessarily mean you have to go work for Nuvasiv. You could also continue to work for MMI and start selling other equipment, orthopedic equipment, some other orthopedic equipment, not spine equipment. But then it wouldn't fulfill the paragraph's stated purpose, Your Honor. So if you go on, write, say, I'm reading the further sentence in 11.7 on 441. Further, Nuvasiv may at any time representative is in poor standing, upon payment of the stated percentage, elect to terminate this agreement and have all compliance agreements assigned to it and require that all other reasonable steps be taken to ensure that the services continue. So it's clear that the compliance transfer, the compliance agreement, is a step to ensure the continued services to Nuvasiv, even though MMI has been terminated. So otherwise, Judge Chen, you've paid $1.7 million for nothing. Because you already have the right under the agreement itself, as you noted, as a third-party beneficiary, to enforce if the employee stays with MMI, if they choose not to join Nuvasiv, after Nuvasiv terminates the ESR and employees didn't all come, say, if they stay with MMI, Nuvasiv already has the right to keep that employee from competing against it without paying any money. It paid the money in order to have the employment agreements transfer and have them released from their obligations not to compete with MMI. That's why you don't get to the ambiguity cannon, Your Honor, because to read it any other way would make these provisions ineffective for their purpose. You can argue your case any way you want, but you've just got a little over a minute. Do you want to save any of your time? May I say something about damages, actually? Say whatever you like. Okay. Because if you aren't going to reverse the liability judgment, then the damages judgment, the punitive damages here can't stand. There isn't sufficient evidence under California law to support clear and convincing evidence that would assure the reasonable assent of every person, which is the standard in California, of the types of behavior that California recognizes support punitive damages. This is just a business tort. And even if you thought there was the ---- Pretty mean tort, though, isn't it? No, Your Honor. Nasty? No, Your Honor. In fact, I mean, I have explained to you our understanding of the ESR, and it's even if Your Honor ---- I know you feel differently. I'm just saying. Yes, but even if Your Honor thinks it's ambiguous, it's still just at most a misreading of a contract agreement. It's not something that warrants $20 million in punitive damages, especially ---- and a $20 million award would be a violation of due process here because it grossly outstrips anything that would be warranted, for there's no reprehensibility here. The State Farm and the Supreme Court State Farm decision says that punitive damages may not be appropriate at all in a situation where there's no reprehensibility, especially here where the compensatory damages are very, very large. Okay. Thank you for your argument. Thank you, Your Honor. We appreciate it. We'll hear from your opponent. I'll bet you don't want us to change the district courts. Your Honor has it exactly right. Thank you, Your Honors. May it please the Court, Daniel Levin, Munger Tolson, also on behalf of Chris Madsen and Madsen Medical. The jury here heard two weeks of evidence that Nuvasiv had formed and executed a plan to steal Ms. Madsen's business. When that happened, Nuvasiv sued Ms. Madsen. It was only after their claims fell apart that they were left with only Ms. Madsen's counterclaims, which the jury ultimately found in her favor. Let me take the arguments in the order that Ms. Maynard addressed them and start with causation. Number one, we're on sufficiency of the evidence review. So could any reasonable juror have found a substantial factor here? The answer to that is yes. There's two fundamental problems with the argument that Nuvasiv is making. Number one, the resulting harm here, just to be clear, the harm is the lost profits, which start after the termination in 2012 and go on out into the future. That's number one. Number two, what is the test? What is the substantial factor test? And I would urge you to look at the South Coast framing decision from the California Supreme Court, which is cited in the reply brief of Nuvasiv, because it lays it out pretty clearly. It has this antecedent word that they like and they talk about, but then it goes on and it says, if the injury would have happened anyway, whether the defendant was, and it's talking about negligence, whether the defendant was negligence or not, then the negligence can't be a cause and fact. Would it have happened anyway? Well, the evidence here is more than sufficient to say this would not have happened absent the tortious interference. There is just no way you can read this record and not see that linkage. There was a plan starting, there was evidence starting back in July. They were meeting with the reps, continues into August. The day that this all happens, Nuvasiv has a whole team in Las Vegas with pre-drafted agreements with an HR rep. They hit, sure, they hit send on the e-mail sending the termination letter and then everyone signs the contracts. The fact that you're a little clever and you hit send on one thing before doing the other, that doesn't get you out. Did your client assert a theory that all the conduct, all the preparatory conduct, the plan, the conspiracy, et cetera, was in fact a tortious breach? Or do you agree that the breach itself was the actual, you know, termination of employment or getting the employees to sign on? So I think the way to think of it is that the breach culminated with the signing, but they clearly argued to the jury this was all part and parcel of a single plan. That was the argument in closing, the fundamental argument. They had a plan. There was no other plan. The breach did not culminate until the actual hiring. Well, it culminated, ultimately the harm started accruing after the hiring, sure, where they lost all the business. But it culminated with the hiring, yes. But was there inducement before? Absolutely. Was there evidence of inducement before?  Because, I mean, you have text messages and e-mails. They're communicating back in July. They're meeting back in July. But you're not contending the inducement alone would have constituted a tortious, before the culmination. In order to have the lost profits, Your Honor, in order to have that, you have to have the plan has to culminate. Yes. Okay. Can I ask you this, Counsel? As you know, your opposing counsel takes the position that the various documents involved here actually permit Nuvasiv to hire the employees of If they decide not to go with them, then they couldn't compete by continuing on with Nuvasiv and so on. It was all part of a preset plan. It was all understood that what you're alleging here is no more than carrying out what the contract allows. I know you disagree with that. But what's your best argument that they're wrong on that point? So I've got a whole lot of arguments. Give us your best. Give us your best one, yes. To me, the simplest one is they didn't even arrive at their theory 11-7 until they got to trial. When they put their discovery responses in, they said, 11.5 is what we need to be able to do this. That was the only provision they said justified their conduct. Now, they abandoned that at trial and they had a new provision. That, to me, is indicative as anything else of why they're wrong. But let's talk about the agreement itself and why it is that their agreement, that their interpretation of it doesn't make sense. Clearly, it is not unambiguously correct. First off. The contract is unambiguous or it's unambiguously correct? For them to win, they've got to show it's unambiguously in their favor, and that's just not so. So first off, this final sentence of 11-7 that they're hanging their hat on now is it is embedded within the change of control provisions, and we lay out in the brief why it makes a whole lot more sense to read it as a change of control provision only. Even if they're right, even if it applies outside change of control, it doesn't mean they get to hire the employees and have all of the employment agreements assigned over. It's not what it says. It says you pay that stated percentage, you get two things. Number one, you get the compliance agreements. What are they? Well, you go to 6-13. They're defined. They're a particular thing. They're a non-compete with newvasive, a right to be a third-party beneficiary. So they get that non-compete that protects them. What's the benefit of getting an assignment as opposed to continuing status as a third-party beneficiary? So I think the most obvious one is as an assignee, you step into the shoes. You become the contracting party. It removes MMI from the picture. In a scenario where you've now terminated them, it makes sense to say, look, you'd want to remove the distributor from the picture. You now own these compliance agreements. I think that's the most obvious reason why you'd want to do that. The other thing here I think that when they say, well, it has to be the whole agreement. It's got to be because otherwise it's not much. I mean, think of a sort of simple hypothetical. Here the compliance agreement happens to be embedded in the employment agreement. If they had drafted differently and they'd put the compliance agreement as addendum A or something, I don't think there'd be any dispute. All you get, you rip that page off. It's separately signed. You hand it over. But there's absolutely nothing in this contract that says you must put the compliance agreement embedded in a larger employment agreement. It's just a happenstance here. So their argument that sort of the only possible thing that can make sense is the entire employment agreement gets assigned over. It does not make any sense. There's nothing in the agreement that says it. And by the way, if that's true, if the whole employment agreement is signed over, why are they signing new employment agreements on August 31st? The employment agreement is assigned over. They're now the employees of Newvasive, and obviously that can't be the case. They sign new agreements. It would be contrary to Nevada law to assign without consent, to sign an employment agreement. So what you get is this particular defined bundle of rights. They got them. And then you get the second right you get is the reasonable steps. And we talked about it. Reasonable steps means reasonable steps. You might have to make, MMI might have some obligations. It might have to make customer lists available. It might have to make reps available to cover a surgery that's happening the next week. I mean, there's lots of things that would be perfectly reasonable, and it would fall on MMI. But what you don't have to do is turn over your entire business. This is a human capital business, and they took all of her human capital, seven of her nine sales reps. These are trained employees who could have been out selling other things, not competing with Newvasive, but could have been out selling other things and doing all sorts of business that all disappeared. Did MMI have anything that they could put these folks to to start selling? At the time, no. They were an exclusive distributor. But these are, they have, well, I'll tell you what they do have, Your Honor. They have relationships at every hospital in Las Vegas. I mean, they have the human capital. So could they go out and find a new product to sell? Sure they could have, as long as it didn't compete with Newvasive. So let me turn. Well, what did they get for their $1.75 million? They got exactly what the contract said. They got assignment of the compliance agreements, and they got the right to have MMI take reasonable steps to ensure the undirected service. They got exactly that. Sort of like transitional services? Yeah, transitional. Exactly, Your Honor. Now, and they made a big point below that. I don't think they really pushed it as much here that, well, that's too much to pay. But I think the district judge was very clear that it's not for the court to sort of tease out whether that 1.7 is the right amount of money to pay for that. That's up to, and by the way, Newvasive wrote the agreement. But that's up to the, you don't tease out. Wouldn't that inform what the parties intended? I mean, the bigger the amount paid, the more you would have thought they'd gotten for it? Your Honor, actually, I don't think so. Because I think this is completely at the discretion of Newvasive. The other thing I think that's instructive here to look at is what they are saying is that this contract effectively gave them a call right on Ms. Madsen's business. Because remember, they unilaterally control the quota system. So they can raise the quota. They basically can force her into poor standing. And what they're saying is then we write a check for $1.7 million and we basically buy your business. Because we buy all your reps. It's a human capital business. It's not a, you know, that's it. That's a very, very strange way to write a call option. So, and we just don't think it's a reasonable. The idea that the poor standing is something that is within the total power, unilateral power of Newvasive to set? Exactly, Your Honor. The other thing that I would say, Your Honor, about this is you have to look, when you're looking at 11-7, you have to go back and look at 11-5, which says if they want to hire. 11-5 gives them the right to hire the reps if there's a material breach. Right? So they've set it up. That right exists. The problem is they got to trial and they gave it up. They didn't have any evidence of a material breach. So they switched gears and went to 11-7. But it's not that there's not a scenario where you get the reps. It's just that there wasn't evidence here to support that scenario. So you really have to see some difference there. Your Honors, let me turn to the final point that Ms. Maynard raised, which was the punitive damages. Again, we're on sufficiency of the evidence review of reprehensibility. Drawing every reasonable inference in favor of the verdict, could a reasonable juror have found clear and convincing evidence? The answer to that is yes. I mean, what was going on here? You had a secret plot that went on for months leading up to this. You had Nuvasiv being blind copied on sensitive financial information. They didn't stand up and say, hey, by the way, your employees are acting totally inappropriately. No, they were happy to get it. You have them meeting with the employees. You have everyone in the room. You have, frankly, you have them being sent objectionable and insulting emails that they never stand up and say a thing about. And then they all show up and Nuvasiv hires away all the employees. This was not just an ordinary business tort. This was not interference in one employee. This was stealing the business. Wouldn't the jury have to have found by clear and convincing evidence that Nuvasiv knew that they didn't have the right, that they were violating, that they weren't contractually protected? And given the ambiguity of 11.7, why is there such clear and convincing evidence of that? Two things. That's a defense of good faith. The jury was entirely justified. And on sufficiency review, I think the Court is obligated to reject the testimony that they heard that went to good faith. And, frankly, there was almost none. Remember, the testimony that would go to good faith. Excuse me, Your Honor. Number one, Nuvasiv didn't put on a testimony at the punitive damages stage. They could have, but they didn't. The person who testified about this that they cite in their brief was Mr. Hannon, who was the general counsel. And let me say a couple things about his testimony. Number one, he testified at length on direct exam about changes in the contracts from 2008 to 2011. And he said, I explained those fully to Ms. Madsen. He went on and on about how he explained these, made a lot of explanations. And he said, well, one of those changes is we added that last sentence to 11.7. So that was going to be evidence that they should have been unnoticed. Now, the problem was, on cross, he was shown the 2008 agreement, and it had the language. That is, they didn't add the sentence. And he said, oh, I misremembered. So, frankly, the jury could have disregarded everything Mr. Hannon said. His testimony was not credible. And on sufficiency review, you're obligated to draw that inference against him. That's one. I gather that your position is that they couldn't have just been relying on the contract, because if they were, they wouldn't have had all these pre-meetings, all the new employment contracts, all the other things that were done before, because if they were right, none of that would have been necessary. That is absolutely true. And they don't even say it, really. I mean, why on earth in discovery are they saying, oh, we're relying on 11.5, which gives us that hiring right? They don't get to 11.7 until they can't defend 11.5 anymore. So the idea that they were there just in good faith, you know, they got this automatic right. Then you send the termination letter, you reach out to the employees and say, hey, now you work for us. That is not what happened. The jury was entitled to find what happened here instead was a plot, was a plan, and was reprehensible and met the standard for punitive damages. The jury was entitled to find the evidence. I'd say the evidence really could only lead to that result, but that's not the question here. We're not retrying the case. Is it necessarily inconsistent to work about secretly to kind of recruit these folks, thinking you actually had the right but you didn't want to tip off MMI, you wanted to do it in a way that, isn't there an innocent explanation, inference? A, I don't think so, no. But B, is there any evidence? No, zero. I mean, zero evidence that that's what was going on. They just didn't put any evidence that that was going on. They didn't put anyone on the stand who said that was what was going on. It's not even a question of, and the jury gets to draw, you know, the inferences we draw here, the inferences in favor of the verdict, but there's just nothing. There's nothing that would suggest that what was going on here was, you know, we're just dotting our I's and crossing our T's because we've got this right and, you know, we just want to make sure everyone's happy. That is not what's happening. Is there any evidence in the record that suggests that any of the, shall I say, the pre-termination activities were simply, like you say, dotting I's, crossing T's? Was anything like that put on? No. No, there was none. And, frankly, it was they had a chance. I mean, to Judge Chen's question, the judge said they could put on evidence at the punitive damage phase, and they didn't. So the only evidence of, quote, good faith was the testimony you had mentioned about changes? The only thing that I'm aware of, Your Honor, and maybe they'll point to something else. In their brief, they cite Mr. Hannon's testimony at Excerpt 275 where he says, and I would urge you to read that whole selection because he says, he talks about what the in-compliance agreement is, and he says it's the agreement that the distributor signs with the employee to reflect the terms that are in the ESR. And then he says, he goes on, which they don't quote in their brief, he goes on to say the primary thing being the non-compete provisions. I mean, they're not saying we get, he doesn't even say we just automatically get these employees, but in any event, there's just nothing here that would say a reasonable juror was compelled to find good faith, which is really the test here. Was a reasonable juror compelled to find good faith? Absolutely not. I've got just a couple minutes, I'll briefly address the multiplier issue under State Farm. 2.7 to 1 is in the heartland of State Farm. There is no reason to upset that. Frankly, they did not make this argument to the district judge, but even if you're going to entertain it here, it is well within the standard given the reprehensibility here, given that this is a classic case of a big business bullying a small business. The jury was entitled to find malice and reprehensibility there, and 2.7 to 1 is perfectly reasonable under State Farm where we've seen lots of examples of even greater multiples, but 2.7 to 1 is right there on the heartland. Your Honors, I'm happy to address the tortious interference if there's questions, it wasn't, didn't come up, or I'm happy to address the jury instructions if there are any questions on that. Any questions? I think not. Thank you, Your Honors. Counsel, you used all your time, but because you were so enthusiastic, we're going to give you two more minutes. I know you feel strongly about this, but you've got to stick with two minutes, okay? Thank you very much, Your Honor. I'll make three quick points. Okay. First, 11.7 has been Nuvasiv's theory all along. It's in the termination letter. Point your Honors to SCR 319 where first Nuvasiv does assert the 11.5 right and default, asserts that MMI is in default and that gives them the right to hire employees. That is true, but then the letter goes on and says, nevertheless as we have repeatedly discussed in an effort to effectuate a smooth transition and so that the services of MMI sales representatives on behalf of Nuvasiv are not interrupted, Nuvasiv elects to pay MMI the stated percentage as set forth in Section 11.7 in exchange for immediate assignment of all compliance agreements with MMI. This has been Nuvasiv's theory since the day of termination, and Judge Smith, it is perfectly reasonable business behavior to plan accordingly, and there is evidence in the record that there were other alternative plans. They offered Ms. Madsen to stay on as a consultant. They were exploring options. It's what any reasonable business would do faced with what we are faced with. Counsel, let me just say, I practiced business law for 37 years. I have rarely seen evidence of a more extensive, what shall I say, preplanned attempt to take over a business than I read in this case. So I'm not sure I feel the same as you do about the innocence of the whole thing. What can you tell me that suggests that I'm just totally off base on that? First, Your Honor, it's undisputed that Nuvasiv had the right to terminate the ESR. That would have caused all of the harm that the jury has awarded. Full stop. If that had been all that had happened, there would be no different relief, and it's undisputed that the agreement gave Nuvasiv was in, MMI was in poor standing and had been for multiple quarters. The nasty texts and emails are MMI's employees. MMI brings this problem to Nuvasiv. I understand. So your time is up. I appreciate your indulgence, Your Honor. Thanks to all counsel. We know this is a, people have strong feelings about the case, but I'm sure the parties can recognize their counsel has done a good job in arguing their position. The case just argued is submitted and the court stands in recess for the day. All rise. The court on this session stands adjourned.
judges: Schroeder, M. Smith, Chen